UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No.

BRIAN RAYMOND,           )
JANE T. RAYMOND, and     )
CHRISTOPHER P. JAKUBIAK  )
                         )
    Plaintiffs,          )
                         )
v.                       )
                         )
CITY OF WORCESTER,       )
SH-BOOMS NATIONAL, INC., and )
JASON DUMAS,             )
JAMES GUITTAR, and       )
MICHAEL GIROUARD, Individually )
and as Police Officers   )
                         )
    Defendants.          )
─────────────────────────)

99-40159-NMG



## COMPLAINT

## I. INTRODUCTION

By this action, Plaintiffs assert claims for, among other things, violations of their civil rights arising from an incident where Worcester Police Officers and employees of Sh-Booms nightclub, without probable cause or justification, seized upon, wrongfully detained, and physically battered the Plaintiffs. The Defendants' caused the Plaintiffs to suffer serious physical injuries, emotional harm, humiliation, and deprivation of their liberty without just cause. But for Defendants City of Worcester and Sh-Boom's failure to properly hire, retain, train, and supervise its employees, this incident would not have occurred.

RECEIPT # 402921
AMOUNT $ 150.00
SUMMONS ISS. _____
L^ ___ ULE 4.1 _____
W/___ OF SERV. _____
MCP ISSUED _____
AO 120 OR 121 _____
BY DPTY CLK _____
DATE 9-14-99

1

## II.    PARTIES

1.    Plaintiff Brian Raymond ("Raymond") is an individual residing in Worcester, Massachusetts.

2.    Plaintiff Jane T. Raymond ("Jane") is an individual residing in Worcester, Massachusetts.

3.    Plaintiff Christopher P. Jakubiak ("Jakubiak") is an individual residing in Worcester, Massachusetts.

4.    Defendant City of Worcester ("Worcester") is a municipal corporation established under the General Laws of Massachusetts and as such, Worcester did promulgate and otherwise adopt under color of law certain rules, practices, procedures, and policies for use by its law enforcement officers as well as certain ordinances, by-laws, custom and usages which deprived the Plaintiffs of their rights, privileges and immunities under the Constitution and the laws of the United States.  Worcester is vicariously liable for the wrongful acts of its employees.

5.    Defendant Sh-Booms National, Inc. ("Sh-Booms"), upon information and belief, is a corporation organized under the laws of the Commonwealth of Massachusetts, and is the owner and operator of an establishment called "Sh-Booms," with its principal place of business at 213 Main Street, Worcester, Massachusetts.  Sh-Booms is in the business of providing nightclub entertainment.  Sh-Booms is vicariously liable for the wrongful acts of its employees.

6.    Defendant Jason Dumas ("Dumas"), upon information and belief, is a resident of the Commonwealth of Massachusetts.  His address is presently unknown to Plaintiffs.  Upon further information and belief, at all relevant times, Dumas was an

employee, agent, and/or apparent agent of Sh-Booms, or acted under such circumstances or in such a way that Sh-Booms should be estopped from denying an employment or agency relationship with Dumas. At all times material hereto, Dumas was acting in the course and scope of his employment or agency and on behalf of Sh-Booms.

7.    Defendant James Guittar ("Officer Guittar") is an individual residing, upon information and belief, in the Commonwealth of Massachusetts. At all relevant times, Officer Guittar was an employee, agent, and/or apparent agent of Worcester, or acted under such circumstances or in such a way that Worcester should be estopped from denying an employment or agency relationship with Officer Guittar. At all times material hereto, Officer Guittar was acting in the course and scope of his employment or agency and on behalf of Worcester.

8.    Defendant Michael Girouard ("Officer Girouard") is an individual residing, upon information and belief, in the Commonwealth of Massachusetts. At all relevant times, Officer Girouard was an employee, agent, and/or apparent agent of Worcester, or acted under such circumstances or in such a way that Worcester should be estopped from denying an employment or agency relationship with Officer Girouard. At all times material hereto, Officer Girouard was acting in the course and scope of his employment or agency and on behalf of Worcester.

## III.    JURISDICTION AND VENUE

9.    The claims set forth in this Complaint are within the general jurisdiction of the United States District Court because the action arises under 42 U.S.C. § 1983. Venue is proper in the Worcester Division of the District of Massachusetts pursuant to 28 U.S.C. § 1391(b). All conditions precedent have been performed or have occurred.

## IV.    STATEMENT OF FACTS

### A.    Raymond Battered and Physically Removed From Sh-Booms

10.    On or about September 20, 1997, at approximately 10:30 p.m., Plaintiffs, along with friends and family members, arrived at Sh-Booms. The group was celebrating the engagement of Jane and Raymond, which occurred that day.

11.    During that evening, early on or about September 21, 1997, Raymond, Jakubiak, and another individual sat at the bar, ordered, and were served beers. After paying for the order, Raymond began to take a sip of his beer. Without warning or justification, Dumas, who was employed by Sh-Boom's as a security person, approached Raymond, grabbed his bottle, put it back on the bar, and told him he was all done. Without provocation, Dumas then grabbed Raymond around the neck, held him in an headlock, and forcibly pulled him outside of the establishment with the assistance of other Sh-Boom's employees.

12.    Upon information and belief, after ejecting Raymond from Sh-Booms, Dumas falsely informed Officer Guittar that Raymond had been ejected because he struck a woman in the establishment.

### B.    Plaintiffs Attacked and Wrongfully Detained by Worcester Police

13.    Once outside, Raymond waited for a moment for his fiancée and friends to join him so that the group could return home together. At that time, Officer Guittar, who was working a paid detail at Sh-Booms, approached Raymond and asked what he was doing. In response, Raymond told Officer Guittar that he was waiting for his friends so that they could all go home. Officer Guittar then stated, "Get the f____ out of here," and

4

pushed Raymond in the opposite direction of where his car was parked. Officer Guittar ordered Raymond to keep going in that direction.

14.    Raymond complied with Officer Guittar's order, leaving Sh-Boom's property and walking all the way to the corner of the next street. Raymond waited at that corner so that his fiancée Jane and his friends, who were not with him at the time he was ejected from Sh-Booms and did not know his whereabouts, would see him when they exited.

15.    While Raymond waited on the street corner, Officer Guittar left the Sh-Boom's premises and approached Raymond with Officer Girouard. Officer Guittar and Officer Girouard (collectively, the "Officers") positioned themselves on opposite sides of Raymond. The Officers asked Raymond to explain what he was doing. Raymond explained that he was simply waiting for his fiancée and friends. Without provocation or justification, the Officers began cursing at Raymond and asking him if he liked to hit women. The Officers then began pushing and physically battering Raymond.

16.    After battering Raymond, without justification or probable cause, the Officers then informed Raymond that he was under arrest. The Officers then physically dragged Raymond to a nearby police cruiser, struck his head on the hood of the cruiser, and continued to punch him while placing handcuffs on him.

17.    The Officers also sprayed Raymond in the face with OC spray. The Officers sprayed Raymond without regard for the fact that he had completely submitted to arrest, was already handcuffed, and was bleeding profusely from multiple injuries to his head and face as a result of the vicious and unprovoked police beating. The OC spray went into Raymond's eyes and open wounds, causing additional extreme pain. After

being handcuffed, the Officers continued to batter Raymond.  Raymond was placed in a police wagon.

18.    During the melee, Raymond's fiancée, Jane, approached the scene and observed Officer Guittar and Officer Girouard battering Raymond.  She further observed Raymond covered in his own blood, with blood also on the hood of the police cruiser.

19.    Jane, crying, pled with the officers to tell her why her fiancée was being arrested, and why he was bleeding profusely.  The Officers refused to answer Jane and responded with vulgarities.

20.    As Jane observed, Officer Girouard lifted Raymond from the hood of the cruiser, and struck him with a closed fist directly in the face, while asking a bystander, "Do you want a piece of this?"

21.    One of the Officers then sprayed Jane in the face with OC spray without provocation or justification.

22.    The Officers placed Jane in handcuffs, and escorted her into a police wagon.  While stepping into the police wagon, the Officer released Jane causing her to fall backwards onto the ground with the handcuffs pushing directly into her back.  As Jane was crying and in pain from being dropped to the ground, the Officers began laughing.  The Officers then picked her up and physically threw her into the police wagon.

23.    Jakubiak, who stood in the crowd of onlookers and witnessed the beatings of Raymond and Jane, asked what was going on.  As one Officer ordered him to move back, another Officer simultaneously sprayed OC spray into the crowd of onlookers and into Jakubiak's face, causing him to drop to the ground in pain.  Officer Guittar then

6

grabbed Jakubiak, falsely stated that he had struck a police officer and placed him under arrest. Jakubiak was placed in the police wagon with Raymond and Jane. Jakubiak did not strike any police officer.

## C.    Mistreatment by the Worcester Police Continues After Plaintiffs in Custody

24.    While the Plaintiffs were being transported to the Worcester Police station, the Worcester Police officer operating the wagon drove extremely fast, and took turns suddenly and sharply, causing the Plaintiffs, who were unrestrained in the rear of the wagon, to be thrown and bounced about the passenger area.

25.    Once they arrived at the police station, the Plaintiffs were placed in holding cells. The cells were extremely filthy and grimy, the blankets were soaked with urine, there was urine on the floor, rotting food, and insects throughout.

26.    The injuries suffered by Plaintiffs and caused by the Officers were significant, substantial, and severe. Raymond suffered injuries including, but not limited to, gastrointestinal trauma, and severe cuts and bruises causing permanent scars. Jane suffered injuries including, but not limited to, back pain, a severely sprained wrist, and cuts and bruises. All Plaintiffs suffered the painful effects of OC spray.

27.    The Worcester police officers, including, but not limited to, Officer Guittar and Officer Girouard, failed to provide prompt medical attention to the injured Plaintiffs. Plaintiffs remained in holding cells for approximately 90 minutes before the booking process began. Only then were the Plaintiffs allowed to rinse their eyes with water to counteract the harmful effects of the OC spray.

28.    The Worcester police officers, including, but not limited to, Officer Guittar and Officer Girouard, never allowed Jane and Jakubiak to be transported to a hospital for treatment.

29.    Raymond was finally transported to UMass Medical Center approximately two (2) hours after his injuries were inflicted.  The Worcester police officer that transported him continued to be rude and abusive.  When they arrived at the hospital, the officer pulled Raymond out of the wagon in a manner that caused him to fall to the ground.  The officer then threatened to bring Raymond back to the police station without the benefit of treatment unless he moved more quickly into the hospital.  However, Raymond was unable move more quickly because he was handcuffed and in leg shackles at the time.

30.    In the trips both to and from the hospital, the Worcester police officer operated the van at a very high rate of speed, and took sudden and sharp turns, causing Raymond to be thrown and bounced about the passenger area of the wagon.

**D.    Defendants Fully Acquitted of Criminal Charges Filed by Worcester Police**

31.    Following the events of September 20 and 21, 1997, the Officers prepared false police incident reports in an attempt to cover-up and justify their actions.  Among other things, these reports falsely stated that Raymond assaulted Dumas in the establishment, that Raymond stood outside Sh-Booms "with clenched fists in a fighting stance," that Raymond initiated the altercation with the Officers, that Jane "began fighting PO Girouard," and that Jakubiak punched Officer Girouard.

32.     Based on the false reports submitted by the Officers, the Worcester Police Department applied for and secured complaints against the Plaintiffs for various criminal charges, all without probable cause.

33.     During a jury trial held on or about August 4, 1998, Officer Guittar and Officer Girouard provided knowingly false testimony in a continuing effort to justify their conduct and to harm the Plaintiffs.  At the conclusion of the jury trial, the Plaintiffs were fully acquitted of all of the criminal charges filed against them by the Worcester police.

## V.    STATEMENT OF CLAIMS

**COUNT I**
**42 U.S.C. § 1983 CIVIL RIGHTS VIOLATIONS**
**CITY OF WORCESTER**

34.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 33 as if the same were fully set forth herein.

35.     Defendants Officer Guittar and Officer Girouard arrested Plaintiffs without probable cause or any justification therefor.  Defendants Officer Guittar and Officer Girouard also physically battered Plaintiffs and sprayed Plaintiffs with OC spray, all without reason or justification.  After causing the Plaintiffs to suffer significant injuries, the Officers failed and refused to provide Plaintiffs with prompt medical attention.

36.     At all relevant times, Officer Guittar and Officer Girouard acted within the course and scope of their employment as police officers for the City of Worcester.

37.     Defendants Officer Guittar and Officer Girouard used unreasonable, unnecessary, and excessive force while arresting and detaining Plaintiffs.  The extreme

force used by the Officers on Plaintiffs, including but not limited to striking Raymond's head onto a car, punching with closed fist, pushing, and OC spray, was unprovoked and was initially inflicted prior to any attempt by the Officers to arrest Plaintiffs. The unreasonable force continued without Plaintiffs actively resisting arrest or attempting to evade arrest by flight.

38.    At the time of the arrest and all other relevant times, Defendant Officers were acting under color of the laws and regulations of the Commonwealth of Massachusetts and the City of Worcester Police Department. The Worcester Police Department had policies and customs in place that enabled its agents and employees to act with deliberate indifference to the Constitutional rights of individuals. In particular, the Worcester Police Department tolerates misconduct by its police officers and encourages misconduct by failing to adequately supervise, discipline, or train its police officers.

39.    These policies, customs, and/or pattern of conduct, upon information and belief, consists of a large number of acts of unreasonable, unnecessary, and excessive force, and failure to provide prompt medical attention, upon Plaintiffs and others by officers, agents, servants, and/or employees of the City of Worcester, including but not limited to Officer Guittar and Officer Girouard. For example, Worcester's policies, customs, and/or pattern of conduct are manifested by an incident on or about July 7, 1996, in which Officer Guittar and other Worcester police officers were alleged to have battered an arrestee, Mr. Amaldo Rodriguez, without justification, as described in the newspaper report attached hereto as Exhibit A. This incident was the subject of a civil action in the United States District Court, District of Massachusetts, Worcester Division,

10

entitled *Amaldo Rodriguez v. Joseph Hearn, James Guittar, and Keith Roberts*, CA No.

98-CV-40191. Details of other incidents of similar misconduct by the Worcester Police

Department are unavailable to the public because of Worcester's policy and custom of

refusing to release reports of such incidents, as more fully described in the newspaper

articles attached hereto as Exhibit B.

40.    The exercise of these established policies and customs violated Plaintiffs'

clearly established rights under the United States Constitution to freedom of unreasonable

seizure of their persons, freedom from the use of unreasonable, unnecessary, and

excessive force, and the right to medical care for injuries received while in custody.

41.    As a direct and proximate result of the policies and customs of Defendant

Worcester, Plaintiffs have suffered from and will continue to suffer from physical

injuries, emotional distress and other damages.

## COUNT II
## 42 U.S.C. § 1983 CIVIL RIGHTS VIOLATIONS
## GUITTAR and GIROUARD

42.    Plaintiffs repeat and reallege each and every allegation contained in

paragraphs 1 though 41 as if the same were fully set forth herein.

43.    Defendants Officer Guittar and Officer Girouard, arrested Plaintiffs

without probable cause or any justification therefor. Defendants Officer Guittar and

Officer Girouard also physically battered Plaintiffs and sprayed Plaintiffs with OC spray,

all without reason or justification. After causing the Plaintiffs to suffer significant

injuries, the Officers failed and refused to provide Plaintiffs with prompt medical

attention.

44.   Defendants Officer Guittar and Officer Girouard acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiffs' Constitutional rights.

45.   Defendants Officer Guittar and Officer Girouard used unreasonable, unnecessary, and excessive force while arresting and detaining Plaintiffs. The extreme force used by the Officers on Plaintiffs, including but not limited to striking Raymond's head onto a car, punching with closed fist, pushing, and OC spray, was unprovoked and was initially inflicted prior to any attempt by the Officers to arrest Plaintiffs. The unreasonable force continued without Plaintiffs actively resisting arrest or attempting to evade arrest by flight.

46.   By their actions and omission, Defendants Officer Guittar and Officer Girouard, who were acting under color of law, violated Plaintiffs' clearly established rights under the United States Constitution to freedom of unreasonable seizure of their persons, freedom from the use of unreasonable, unnecessary, and excessive force, and the right to medical care for injuries received while in custody.

47.   As a direct and proximate result of the wrongdoing by Defendants Officer Guittar and Officer Girouard, Plaintiffs have suffered from and will continue to suffer from physical injuries, emotional distress, and other damages.

**COUNT III**
**42 U.S.C. § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS**
**GUITTAR and GIROUARD**

48.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 47 as if the same were fully set forth herein.

49.   On or about September 20 and 21, 1997, Defendants Officer Guittar and Officer Girouard, acting under color of law, conspired with each other and others to

12

deprive the Plaintiffs of their Constitutional rights, and acted in furtherance of this conspiracy by using unreasonable, unnecessary, and excessive force while arresting and detaining Plaintiffs.

50.    Defendants Officer Guittar and Officer Girouard had a duty to refrain from arresting plaintiffs where there existed no probable cause to do so, to refrain from the use of unreasonable, unnecessary, and excessive force, and to provide prompt medical care for injuries received by the Plaintiffs while in custody.

51.    Defendants Officer Guittar and Officer Girouard, acting jointy and in conspiracy, arrested Plaintiffs without probable cause or any justification therefor. Defendants Officer Guittar and Officer Girouard also physically battered Plaintiffs and sprayed Plaintiffs with OC spray, all without reason or justification.  After causing the Plaintiffs to suffer significant injuries, the Officers failed and refused to provide Plaintiffs with prompt medical attention.

52.    Defendants Officer Guittar and Officer Girouard acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiffs' Constitutional rights.

53.    Defendants Officer Guittar and Officer Girouard used unreasonable, unnecessary, and excessive force while arresting and detaining Plaintiffs.  The extreme force used by the Officers on Plaintiffs, including but not limited to striking Raymond's head onto a car, punching with closed fist, pushing, and OC spray, was unprovoked and was initially inflicted prior to any attempt by the Officers to arrest Plaintiffs.  The unreasonable force continued without Plaintiffs actively resisting arrest or attempting to evade arrest by flight.

13

54.    By their actions and omission, Defendants Officer Guittar and Officer Girouard violated Plaintiffs' clearly established rights under the United States Constitution to freedom of unreasonable seizure of their persons, freedom from the use of unreasonable, unnecessary, and excessive force, and the right to medical care for injuries received while in custody.

55.    As a direct and proximate result of the conspiracy by Defendants Officer Guittar and Officer Girouard, Plaintiffs have suffered from and will continue to suffer from physical injuries, emotional distress, and other damages.

## COUNT IV
### M.G.L. c. 12 §§11H and 11I CIVIL RIGHTS VIOLATIONS
### WORCESTER, SH-BOOMS, GUITTAR, GIROUARD, and DUMAS

56.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 55 as if the same were fully set forth herein.

57.    Plaintiffs timely presented their claims to Defendant Worcester as required by Mass. G.L. c. 258, §4.  A copy of Plaintiffs' presentment letter is attached hereto as Exhibit C.

58.    By the conduct set forth above, Defendants interfered by threats, intimidation, or coercion, or attempted to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by Plaintiffs of rights secured by the Constitution or laws of the United States and/or Commonwealth of Massachusetts in violation of Mass. G.L. c.12 §§ 11H and 11I.

59.    As a direct and proximate result of the wrongdoing by Defendants, who were acting by means of threats, intimidation, or coercion, Plaintiffs have suffered from and will continue to suffer from physical injuries, emotional distress and other damages.

## COUNT V
## CONSPIRACY TO COMMIT M.G.L. c. 12 §§11H and 11I
## CIVIL RIGHTS VIOLATIONS
## WORCESTER, SH-BOOMS, GUITTAR, GIROUARD, and DUMAS

60.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 59 as if the same were fully set forth herein.

61.    On or about September 20 and 21, 1997, by the conduct set forth above, Defendants conspired for the purpose of interfering by threats, intimidation, or coercion, with the exercise or enjoyment by Plaintiffs of rights secured by the Constitution or laws of the United States and/or Commonwealth of Massachusetts in violation of Mass. G.L. c.12 §§ 11H and 11I.

62.    As a direct and proximate result of the conspiracy by Defendants, Plaintiffs have suffered from and will continue to suffer from physical injuries, emotional distress and other damages.

## COUNT VI
## ASSAULT AND BATTERY
## WORCESTER, SH-BOOMS, GUITTAR, GIROUARD, and DUMAS

63.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 62 as if the same were fully set forth herein.

64.    In unjustifiably and intentionally touching and/or using force by striking Plaintiffs, as set forth above, Defendants have committed acts which constitute unjustified, willful, intentional, and malicious assault and battery upon Plaintiffs in violation of the laws of the Commonwealth of Massachusetts.

65.    As a direct and proximate result of the wrongdoing by Defendants, Plaintiffs have suffered from and will continue to suffer from physical injuries, emotional distress and other damages.

15

## COUNT VII
## FALSE IMPRISONMENT
## WORCESTER, SH-BOOMS, GUITTAR, GIROUARD, and DUMAS

66.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 65 as if the same were fully set forth herein.

67.    In falsely and wrongfully detaining, arresting, and imprisoning Plaintiffs without probable cause or justification, Defendants have committed and/or aided and abetted in the commission of acts which constitute an unjustified, willful, and intentional false imprisonment of the Plaintiffs.

68.    As a direct and proximate result of the wrongdoing by Defendants, Plaintiffs were deprived of their liberty, suffered from and will continue to suffer from physical injuries, emotional distress, humiliation, and other damages.

## COUNT VIII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## WORCESTER, SH-BOOMS, GUITTAR, GIROUARD, and DUMAS

69.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 68 as if the same were fully set forth herein.

70.    The knowing, intentional, willful, and/or negligent conduct of Defendants, as set forth above, was extreme and outrageous, beyond all possible bounds of decency, utterly intolerable in a civilized community, and no reasonable person should be expected to bear it.

71.    It was reasonably foreseeable to Defendants that the vicious attacks and serious injuries inflicted by the Officers upon Raymond as witnessed by Jane, and the vicious attacks and serious injuries inflicted by the Officers upon Jane as witnessed by

16

Raymond, would cause Jane and Raymond, who were engaged to be married at the time of the attack, to suffer severe emotional distress at the sight of the other being assaulted.

72.    As a direct and proximate result of the extreme and outrageous conduct by Defendants, Plaintiffs Jane and Raymond immediately suffered from and will continue to suffer from severe emotional distress, physical manifestations of their emotional distress, endured physical and mental suffering, shame, humiliation, and other damages as a result of each witnessing the police attack on the other.

### COUNT IX
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### WORCESTER, SH-BOOMS, GUITTAR, GIROUARD, and DUMAS

73.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 72 as if the same were fully set forth herein.

74.    The knowing, intentional, willful, and/or negligent conduct of Defendants, as set forth above, was extreme and outrageous, beyond all possible bounds of decency, utterly intolerable in a civilized community, and no reasonable person should be expected to bear it.

75.    As a direct and proximate result of the extreme and outrageous conduct by Defendants, Plaintiffs have suffered from and will continue to suffer from severe emotional distress, endured physical and mental suffering, shame, humiliation, and other damages.

### COUNT X
### NEGLIGENCE
### WORCESTER, GUITTAR, and GIROUARD

76.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 75 as if the same were fully set forth herein.

17

77.    Defendants Worcester, Officer Guittar and Officer Girouard owed a duty to exercise reasonable care in detaining, questioning, and arresting Plaintiffs, and properly providing medical attention for Plaintiffs once in custody.

78.    As a direct and proximate result of the extreme and outrageous conduct by Defendants Worcester, Officer Guittar and Officer Girouard, in maliciously arresting Plaintiffs without probable cause, using unreasonable, unnecessary, and excessive force while arresting and detaining Plaintiffs and failing to provide Plaintiffs with proper medical attention and other basic care while in custody, Plaintiffs have suffered from and will continue to suffer from physical injuries, emotional distress, shame, humiliation, and other damages.

## COUNT XI
## NEGLIGENCE
## SH-BOOMS and DUMAS

79.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 78 as if the same were fully set forth herein.

80.    Defendants Sh-Booms and Dumas owed a duty of care to the Plaintiffs, who were lawfully on the premises of their establishment as invitees.

81.    As a direct and proximate result of the extreme and outrageous conduct by Defendants Sh-Booms and Dumas, in ejecting Raymond from the establishment without reason or justification, using unreasonable, unnecessary, and excessive force while doing so, and upon information and belief, falsely reporting to Officer Guittar that Raymond struck a woman, Plaintiffs have suffered from and will continue to suffer from physical injuries, emotional distress, shame, humiliation, and other damages.

## COUNT XII
## NEGLIGENT HIRING, RETENTION, AND SUPERVISION
## SH-BOOMS

82.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 81 as if the same were fully set forth herein.

83.    Upon information and belief, at all times material hereto, Dumas was an employee, agent, and/or apparent agent of Sh-Booms, or acted under such circumstances or in such a way that Sh-Booms should be estopped from denying an employment or agency relationship with Dumas.

84.    At all times material hereto, Dumas was acting in the course and scope of his employment or agency and on behalf of Sh-Booms.

85.    Sh-Booms owed a duty to the public, including but not limited to Plaintiffs, to use reasonable care in selecting, retaining, training, and supervising its employees.

86.    Sh-Booms negligently breached its duty by failing to undertake a reasonable and diligent investigation in relation to the hiring and retention of their employees, including but not limited to Dumas.

87.    Sh-Booms negligently breached its duty by failing to properly and reasonably oversee, supervise, and/or discipline its employees, including but not limited to Dumas.

88.    By breaching its duty, Sh-Booms directly and proximately caused the physical injuries, emotional distress and other damages suffered by Plaintiffs.

19

## COUNT XIII
## NEGLIGENT HIRING, RETENTION, AND SUPERVISION
## CITY OF WORCESTER

89.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 though 88 as if the same were fully set forth herein.

90.    Upon information and belief, at all times material hereto, Officer Guittar and Officer Girouard were employees, agents, and/or apparent agents of Worcester, or acted under such circumstances or in such a way that Worcester should be estopped from denying an employment or agency relationship with Officer Guittar and Officer Girouard.

91.    At all times material hereto, Officer Guittar and Officer Girouard were acting in the course and scope of their employment or agency and on behalf of Worcester.

92.    Worcester owed a duty to the public, including but not limited to Plaintiffs, to use reasonable care in selecting, retaining, training, and supervising its employees.

93.    Worcester negligently breached its duty by failing to undertake a reasonable and diligent investigation in relation to the hiring and retention of their employees, including but not limited to Officer Guittar and Officer Girouard.

94.    Worcester negligently breached its duty by failing to properly and reasonably oversee, supervise, and/or discipline their employees, including but not limited to Officer Guittar and Officer Girouard.

95.    By breaching its duty, Worcester directly and proximately caused the physical injuries, emotional distress and other damages suffered by Plaintiffs.

## COUNT XIV
## MALICIOUS PROSECUTION
## WORCESTER GUITTAR, and GIROUARD

96.     Plaintiffs repeat and reallege each and every allegation contained in

paragraphs 1 though 95 as if the same were fully set forth herein.

97.     Defendants Worcester, Officer Guittar, and Officer Girouard initiated a

criminal proceeding against Plaintiffs without probable cause and with malice.  The

criminal proceeding ended in Plaintiffs' favor with a complete acquittal after a jury trial.

98.     The malicious prosecution by Defendants Worcester, Officer Guittar, and

Officer Girouard caused Plaintiffs severe damage, including, but not limited to, economic

loss, emotional distress, shame, humiliation, and other damages.

## COUNT XV
## ABUSE OF PROCESS
## WORCESTER, GUITTAR, and GIROUARD

99.     Plaintiffs repeat and reallege each and every allegation contained in

paragraphs 1 though 98 as if the same were fully set forth herein.

100.    Defendants Worcester, Officer Guittar, and Officer Girouard instituted

legal process in the form of a criminal proceeding against Plaintiffs for an ulterior and

illegitimate purpose, to cover-up and attempt to justify the wrongful batteries and

detentions of Plaintiffs.

101.    The abuse of process by Defendants Worcester, Officer Guittar, and

Officer Girouard caused Plaintiffs severe damage, including, but not limited to, economic

loss, emotional distress, shame, humiliation, and other damages.

WHEREFORE, Brian Raymond, Jane T. Raymond, and Christopher P. Jakubiak

respectfully request that the Court:

a.      Determine and award Brian Raymond, Jane T. Raymond, and Christopher

P. Jakubiak damages incurred as a result of the wrongful actions and conduct of the City

of Worcester, Sh-Booms, Jason Dumas, James Guittar, and Michael Girouard;

b.      Award Brian Raymond, Jane T. Raymond, and Christopher P. Jakubiak, as

part of any judgment, punitive damages, pursuant to 42 U.S.C. §§1983 and 1985;

c.      Award Brian Raymond, Jane T. Raymond, and Christopher P. Jakubiak, as

part of any judgment, fair and reasonable attorneys' fees and costs, pursuant to 42 U.S.C.

§§1983 and 1985, and Mass. G.L c.12, § 11I;

d.      Enter final judgment in favor of Brian Raymond, Jane T. Raymond, and

Christopher P. Jakubiak and against the City of Worcester, Sh-Booms, Jason Dumas,

James Guittar, and Michael Girouard on all counts of this Complaint; and

e.      Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Plaintiffs hereby demand a trial by jury on all issues so triable.

BRIAN RAYMOND,
JANE T. RAYMOND, and
CHRISTOPHER P. JAKUBIAK

By their attorneys,


Dated: September _14_, 1999

_____
Jeffrey R. Martin, BBO No. 322520
Paul R. Mastrocola, BBO No. 630664
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA. 02110
(617) 345-3000

327430/21330.0

22





# SJC to hear request for police records

By Winston W. Wiley
*Telegram & Gazette Staff*

The state Supreme Judicial Court will hear arguments tomorrow in the case of a Worcester man seeking release of police internal affairs records to defend himself in a criminal assault trial in Worcester Central District Court.

Amaldo Rodriguez is charged with assault and battery on three Worcester police officers. The crimes allegedly took place July 7, 1996, when police responded to a domestic assault call at 14 Harlow St.

Rodriguez and other witnesses, however, have said it was Rodriguez who was beaten by police. A complaint was filed with the Police Department's Internal Affairs Division against Officers Joseph Hester, James Guittar and Keith Roberts.

Criminal complaints alleging assault and battery also were pursued against the three officers by Rodriguez, who was treated that night at University of Massachusetts Hospital in Worcester for lacerations to his head and face.

The officers have denied claims they struck and kicked Rodriguez, who was 17 years old at the time. In separate proceedings, a clerk magistrate and district court judge both found insufficient evidence to pursue complaints against the officers.

The domestic assault charge against Rodriguez, which was later dropped, resulted from a fight between Rodriguez and his sister.

Rodriguez's lawyer, Hector E. Pineiro, had filed requests in district court for all internal affairs documents on the officers, including those unrelated to the Rodriguez case. He also sought access to documented conclusions and opinions of police supervisory personnel pertaining to the case, as well as statements of any police and civilian witnesses with whom Rodriguez came into contact the night of his arrest.

**'COVERED WITH BLOOD'**

Rodriguez had a "large laceration" on top of his head and two smaller ones in the front of his head. He was "covered with blood" and

Turn to SJC/Page A6

---

## SJC to hear man's plea for records

**Continued From Page One**

had "swelling around the left eye" when he arrived at UMass, according to medical records filed with the court.

"We are hoping to find contradictions between statements that have been given by officers in police reports and statements that they have made in open court when the defendant tried to obtain a criminal complaint against the police officers," Pineiro said yesterday.

In May, Judge Patrick A. Fox denied Pineiro's initial request for police internal affairs records. However, he ordered that the city of Worcester furnish to the court statements of civilian and police witnesses to the events surrounding Rodriguez's arrest. The statements were to be turned over to the judge, who would review them and determine what, if any, documents would be released to Pineiro.

**'CHILLING EFFECT'**

The district attorney's office appealed, complaining Fox had not taken into account an affidavit by Worcester Internal Affairs Sgt. Michael J. Kwederis, which stated that disclosure of the records "would have a chilling effect on the ability of IAD to conduct future investigations, because both civilian and police witnesses would be less cooperative in assisting with investigations without the guarantee of confidentiality."

The prosecutor also protested the defendant had not demonstrated a good faith, specific and reasonable basis for believing the records would contain exculpatory evidence. The prosecutor also contended he could not provide the records because they are not in the DA's possession, custody or control.

In a single justice session of the Supreme Judicial Court, Associate Justice John M. Greaney overturned Fox's order for the city to provide civilian and police statements. Greaney deferred the case to the full court.

**'LIKELY TO REOCCUR'**

"The situation presented by the order is likely to reoccur in other cases, involving claims by defendants that the police have abused them and then sought to mask police wrongdoing by bringing criminal charges," Greaney wrote in his July 30 decision.

"Further, there appear to be no standards to guide trial judges when requests for such discovery are made, and because of the protections accorded the records, it is not a complete answer, in my view, to require that in all cases the records be brought to court for review and determination by the judge."

While Greaney noted that the contents of internal affairs investigations and reports are subject to statutory protection under privacy and investigatory exemptions of state public record laws, he stated that there is no Massachusetts precedent directly relating to Rodriguez's case, and other states that have tackled the issue have reached varying conclusions.

"These nuances in the case law from other jurisdictions suggest a conclusion that this is a matter for decision by the full court," he wrote.

In legal briefs filed with the SJC, Pineiro and prosecutors from the Worcester district attorney's office cite many of those cases, in Massachusetts and other states, to buttress their arguments.

Among them is another Worcester case last year in which a defense lawyer went after the counseling records of an alleged rape victim to defend his client against rape charges.

The case against a West Boylston man received national attention when the head of the local rape crisis center was found in contempt and threatened with jail for refusing to produce the counseling records of the complaining witness for a judge's inspection.

The state Supreme Judicial Court ultimately vacated the contempt finding and jail sentence imposed by a district court judge on Maureen Furlong, executive director of the Rape Crisis Center of Central Massachusetts. The state's highest court also issued a ruling tightening the standard judges apply when considering whether to order the production of confidential rape counseling records.

In a unanimous decision, the court ruled that judges should review rape counseling records only when a defendant's motion for their production has demonstrated "a good faith, specific and reasonable basis for believing that the record will contain exculpatory evidence which is relevant and material to the issue of the defendant's guilt."

Pineiro, however, argues that to Massachusetts privileges such as those that exist between rape counselors, attorneys, social workers psychotherapists and their respective clients are different from the protections that exist for public records.



the council's Commerce and Development Committee.

"Hoover said the plan clearly organized and coordinates all economic development functions under the chief development officer. Besides being chief development officer, Shaw is chief redevelopment officer of the Worcester Redevelopment Authority, executive director of the Worcester Industrial Development Financing Authority and president

Turn to PLAN/Back Page

## By Kathleen A. Shaw
TELEGRAM & GAZETTE STAFF

Former nonprofit hospitals purchased by for-profit corporations are not cutting back on the free care they provide or eliminating unprofitable trauma and emergency services, according to a study by the Pioneer Institute for Public Policy Research in Boston.

Hospitals studied by the conservative Boston think tank included St. Vincent Hospital of Worcester, a for-

mer nonprofit not-for-profit hospital and now for-profit enterprise owned by Tenet Healthcare Corp.

The study was written by Jack Needleman, an assistant professor at Harvard School of Public Health. Results are to be discussed this morning by a panel in Boston sponsored by the institute.

Comparing data before and after conversion, Needleman found little or no change in levels of free care or availability of trauma and emergen-

cy ser
not be
summ
terday

**STRU**

"La
prior
after
gling
sider
wrote

He

# Records provide scant info on complaints about police

## By Bronislaus B. Kush
TELEGRAM & GAZETTE STAFF

WORCESTER — A man and woman charge that they were beaten, sprayed with Mace and needlessly arrested by police after an incident with a bouncer at their engagement party in a downtown nightclub.

A father claims his son fled in fear from a wild motorist who chased him about the Burncoat Street area and eventually forced him to the side of Interstate 190. After being pulled over, the youth discovered the motorist was an off-duty city police officer who was upset that the teen-ager had committed a minor traffic violation.

A mentally ill woman — arrested on domestic assault charges — intentionally injured herself in the cell block at police headquarters. She complains later that an officer had offered her a gun so she could "finish myself off."

The allegations are a sample of the 93 complaints of police misconduct recently turned over to the Telegram & Gazette by city officials under orders from the state.

The three cases resulted in investigations by police commanders or the department's Internal Affairs Division. Investigators, however, found no wrongdoing by the police officers involved.

Police officials, who declined to discuss specific cases, said every complaint is taken seriously and examined

Turn to COMPLAINTS/Back Page



INSIDE

# Complaints outlined

COMPLAINTS/from PAGE ONE

thoroughly. They said the public should be assured the job is done properly and that appropriate action is taken in cases of misconduct.

Civil rights activists, however, say it is difficult for them to come to the same conclusions, given that the police investigatory process is mostly closed to public scrutiny.

## PANEL SOUGHT

Several have urged greater oversight over the process, calling for a special panel to monitor such police investigations.

Police officials, however, maintain that they do a good job of policing themselves, adding that special panels may prove meddlesome and actually thwart investigation of police complaints.

It is estimated that Worcester police responded to about 200,000 calls over the past two years. Over the past 24 months, they note, only 125 formal complaints were filed.

On almost every cover letter notifying complainants of the results of an investigation, officials write that the "department is committed to high standards of professionalism and (that) misconduct by its personnel will not be condoned or tolerated."

Judging by what police officials are willing to release, it's difficult, however, for groups and individuals outside the department to assess the effectiveness of the internal investigations. A thorough review of the complaints turned over to the Telegram & Gazette, for instance, is hampered because the reports are heavily edited.

The findings cannot be corroborated because the names of complainants and the police officers have been blacked out, in spite of a directive from the state supervisor of public records that that information not be edited.

## NOT RELEASED

Some complainants, including the couple at the engagement party, filed witness lists and/or photos of injuries that they say resulted from excessive force from police officers. That material was not released to the newspaper.

Additionally, the findings by police officials generally don't specify the action taken against an officer in cases of wrongdoing.

The reports, however, do shed some light.

Last month, City Manager Thomas R. Hoover grudgingly handed over 93 of the 125 requested complaint reports. Hoover refused to release 32 of them, saying they remained under investigation.

The newspaper had sought the reports and other documents to assess how police respond to complaints. Some of the material was turned over after Carolyn Kelly MacWilliam, the state's supervisor of public records, ordered most of the information released.

# Investigation process explained

INVESTIGATION/from PAGE ONE

draw complaints than those assigned to investigative departments, such as the Detective Bureau, or serving on desk duty.

He said it isn't unusual for an officer working 200 or more days on the street annually to draw some complaints.

All complaints, Kwederis stressed, are considered equally important.

Most are investigated by department commanders and are reviewed by Internal Affairs and Police Chief Edward P. Gardella. Violations of departmental procedures or policies usually are handled on this level.

Complaints of criminal conduct or those of a more serious nature are investigated directly by Internal Affairs.

The division, Kwederis said, acts as a clearinghouse and routinely channels complaints to the appropriate supervisor.

Because of its responsibilities, Internal Affairs is staffed by officers of supervisory rank.

There are three sergeants — Kwederis, Edward J. McGinn Jr. and John Cronin Jr. — and the department is headed by a captain, Robert Freeman.

Staff members continually receive training on investigating complaints about police. They have taken part, for example, in conferences sponsored by the Massachusetts Criminal Justice Training Council, the International Association of Chiefs of Police and a private firm specializing in such matters.

Of the 93 cases, 10 of the complaints were sustained in some degree. In seven, the "findings were addressed," meaning administrative action or sanctions were taken against officers involved.

One officer was given a one-day suspension after using profanity over a police radio frequency to describe a woman.

In many of the reports, police are charged with liberally using vulgarities, and there are several complaints of officers using unnecessary and excessive force. Some reports charge police with applying handcuffs too tightly.

## SEARCHES ALLEGED

There also are incidents of police searching homes and vehicles without warrants. One complainant said police smashed electronic equipment and other personal property during a search.

Some complainants charged police with not providing medical help after instances of alleged abuse. In one case, an arrested man said his inhaler was taken from him and he suffered an asthma attack in the patrol wagon used to take him to jail.

Another complainant alleges he or she was denied toilet paper in the cell block.

There was a reported case of police not allowing a person to make a phone call for legal help, and there were complaints of people being randomly stopped by police on the street.

Some of the reports allege racial prejudice. In one complaint, a Florida motorist — apparently Hispanic — was allegedly told by a police officer that Puerto Ricans only come to Massachusetts to collect welfare.

Some cases charge police with helping friends.

## BIKE SOUGHT

One complaint alleges that a police officer rummaged through the complainant's apartment in search of a friend's stolen bike. The officer allegedly threatened the woman with arrest if the bike wasn't found.

In another case, an officer was sanctioned for harassing the boyfriend of the policeman's former girlfriend.

In the complaint about the teenager being chased about the Burncoat neighborhood, the father charged that the police officer went to the youth's school the next day, talked to his principal and threatened hefty fines, as well as taking away the teen's license.

"I believe this (off-duty) police officer acted in a manner of negligence and risky endangerment, not only to my son and his friend, but also to anyone else that was out on the road during the chase," the father wrote.

Almost all the reports charge the police with being overly aggressive.

In the complaint filed by the couple arrested after their engagement party, they note that the bouncer at the bar believed the man had had enough to drink and asked him to turn over his beer. The man did so but asked that he be given a refund for the untouched beverage.

After being thrown out, the man was escorted from Sh Booms on Main Street to the Crowne Plaza Hotel by a police officer, presumably on paid detail.

According to the report, a cruiser with two other officers pulled up as the man waited for his friends.

The man charges he was beaten,

When Internal Affairs investigates a case, arrest and other reports are examined, as well as the officer's record.

Although the complaints are investigated fully, Kwederis said, Internal Affairs doesn't necessarily worry about an officer who receives two or three complaints over 20 years. A red flag is raised, however, if an officer with six months on the job gets that many.

During an investigation, the complainant and witnesses may be interviewed.

The officer involved has the right to union representation. Federal law forbids Internal Affairs investigators from "browbeating" officers suspected of wrongdoing.

"We have to be very careful," Kwederis said, noting that legal and other assistance is available to Internal Affairs officers from the city's Human Resources Department and the city solicitor.

The investigators make their recommendation, but the chief determines if punishment is warranted.

Complainants not happy after an Internal Affairs investigation can take their allegations to the district attorney's office, the state attorney general's office, the city manager's office, the American Civil Liberties Union or the Massachusetts Commission Against Discrimination.

The officer also has recourse. He or she may demand a hearing by the Human Resources Department. The department's findings can be appealed to the state Civil Service Commission and, ultimately, to the courts.

put in handcuffs and then hit some more before being sprayed with Mace.

His fiancee, who also filed a complaint, said she ran to the scene and was berated by police before getting sprayed with Mace herself and arrested.

The man said he ended up with seven stitches in the forehead, a broken blood vessel in the right eye and bruises and scratches. The woman claimed her wrist was sprained in the incident.

## Quonset huts named after R.I. naval air station

THE ASSOCIATED PRESS

DAVISVILLE, R.I. — The Quonset Point Naval Air Station here gave its name to Quonset huts, the World War II prefabricated structures of corrugated steel. The huts, used as both living quarters and storage for U.S. Armed Forces, measured up to 100 feet in length and 40 feet in height.

---

## For the record

### Corrections

The telephone number for information on part-time jobs with U.S. Census 2000 is (508) 793-0212. The number was incorrect in the Veterans Notes column in the Sunday Telegram.

WORCESTER —The actor who plays Biff Loman in the Worcester Foothills Company production of "Death of a Salesman" was incorrectly identified in a review of the show published yesterday. Mark Hughes is playing Biff in the Foothills production.

---

ON THE WEB: www.telegram.com

# T&G argues records public

## Names of police in probes sought

By John J. Monahan
TELEGRAM & GAZETTE STAFF

**WORCESTER** — The Telegram & Gazette asked a judge yesterday to order the Worcester Police Department to immediately disclose the identities of officers named in more than 125 internal affairs complaints.

The newspaper maintains that the information sought is public record and is necessary to evaluate police conduct and use of authority. The Police Department contends that disclosing the names would be an invasion of police officers' privacy.

Because there is little Massachusetts case law on the question of releasing the names of police officers investigated for alleged misconduct, the case may set a legal precedent.

Superior Court Judge Daniel F. Toomey took the newspaper's request for a preliminary injunction under advisement.

## T&G argues for release of police documents

**T&G from PAGE ONE**

City Solicitor David M. Moore, representing the Police Department, told Toomey that releasing the officers' names would cause them harm that could not be undone. He said the issue should not be decided until the city can present testimony at a trial.

Granting immediate access, Moore said, would deny the city the chance to present a full explanation of the arguments for keeping the names private and the dangers of disclosing them.

Moore said that the state's public record law allows the names of people lodging complaints against police officers to be kept secret in order "to encourage citizens to be candid with police."

Furthermore, he said, if other officers learned the findings of misconduct cases and disciplinary actions taken, the quality of internal affairs investigations would suffer.

"Everyone in the department would know who was responsible" for the findings against individual officers, Moore said. That, he added, would hamper internal investigations.

Moore said the Telegram & Gazette could review the adequacy of internal affairs investigations "without knowing the police officers' names."

The newspaper is seeking the release of the identities of city police officers who were the subjects of citizen complaints in 1997 and 1998. The information was first requested last August. The city eventually responded by releasing heavily edited copies of complaints, in which the names of officers accused of misconduct, the names of witnesses and some dates and locations were blacked out.

In January, Carolyn Kelly MacWilliam, the state supervisor of public records, ruled that the information is public and should be turned over to the newspaper. The Telegram & Gazette filed a lawsuit after the city and Police Department continued to refuse to release the information.

Yesterday's hearing before Judge Toomey focused on the issue of the officers' names. The newspaper maintains that the release of additional information sought — including the disposition of cases involving alleged police misconduct — can be addressed when its suit comes up for trial.

Vincent F. O'Rourke Jr., the lawyer for the newspaper, told the court that the names of officers accused of misconduct are needed to determine if there are multiple complaints against individual officers, whether any officers received preferential dispositions and whether high-ranking police officials are named in any complaints.

O'Rourke said the state public record law's exemptions for investigative material should not apply. He noted that copies of complaint forms are kept by citizens who file complaints and that dispositions are mailed to the complainants when investigations are completed.

"These are public records," O'Rourke said.

O'Rourke also argued that police

cannot claim privacy for their official conduct once they accept a public trust.

The information sought by the newspaper, he said, involves the "public conduct of a public officer."

He said the public has an overriding interest in knowing whether police are properly and fairly enforcing the law, and whether the city is properly overseeing use of police powers.

"Secret, star chamber-type proceedings breed distrust," he said of internal police investigations not subject to public scrutiny.

He argued that any privacy interest is outweighed by the public interest.

"I find it very troublesome that the city is concerned that officers wouldn't conduct fair investigations if they know the findings may become public," O'Rourke told the court.

"This information is from 1997 and 1998 reports. If we delay on this, the information will become stale," he said. "To fulfill the public's right to know, it should be made public."



# BURNS & LEVINSON LLP

C o u n s e l l o r s    a t    L a w

125 Summer Street, Boston, MA 02110-1624
Telephone 617-345-3000 Facsimile 617-345-3299

Michael R. Gottfried
617-345-3450



December 22, 1998

<u>**CERTIFIED MAIL - RETURN RECEIPT**</u>

Raymond V. Mariano, Mayor
City of Worcester
City Hall
455 Main Street
Worcester, MA 01608

      **Re:**   **Formal Notice of Demand Pursuant to Massachusetts**
            <u>**General Laws Chapter 258 and All Other Applicable Laws**</u>

Dear Mayor Mariano:

      Please be advised that this office represents Brian Raymond, Jane Raymond (formerly Jane Mioglionico), and Christopher Jacubiak (collectively, the "plaintiffs") in their claims for damages against the City of Worcester and other entities and individuals for pain and suffering, emotionally inflicted harm, and mental distress resulting from negligent and/or intentional acts of the City of Worcester, its agents, officers, servants or employees, including, but not limited to Worcester Police officers who, without probable cause or justification, seized upon, wrongfully detained, and physically battered the plaintiffs. The plaintiffs hereby make presentment of their claims, pursuant to Mass. G.L. c.258, against the City of Worcester, the Worcester Police Department, and the individual police officers, including but not limited to Officer James Guittar and Officer Michael Girouard, responsible for damages arising out of the unjustified and wrongful conduct described below, pursuant to 42 USC § 1983 and other applicable state and federal statutes.

      On or about September 20, 1997, at approximately 10:30 p.m., the plaintiffs, along with friends and family members, arrived at Sha-Booms on Main Street in Worcester. The group was celebrating the engagement of Mioglionico and Raymond, which occurred that day.

      Later in the evening, Raymond, Jacubiak, and another individual sat at the bar, ordered, and were served beers. After paying for the order, Raymond began to take a sip of his beer. A Sha-Boom's security person approached Raymond, grabbed his glass, put it back on the bar, and told him he was all done. Raymond asked if he would be reimbursed for the

# BURNS & LEVINSON LLP

C o u n s e l l o r s   a t   L a w

Raymond V. Mariano, Mayor
May 20, 1999
Page 2

beer.  Without provocation, the Sha-Boom's employee immediately grabbed Raymond around the neck, held him in an armlock, and forcibly pulled him outside of the establishment.

Once outside, Raymond waited for a moment for his fiancée and friends to join him so the group could return home together.  At that time, Worcester Police Officer James Guittar, who was working a paid detail at Sha-Booms, approached Raymond and asked what he was doing.  In response, Raymond told Officer Guittar that he was waiting for his friends so that they could all go home.  Officer Guittar then stated, "Get the f____ out of here," and pushed Raymond in the opposite direction of where his car was parked.  Officer Guittar ordered Raymond to keep going in that direction.  Raymond complied, walking all the way to the corner of the next street.  Raymond waited at that corner so that his fiancée and friends, who were not with him at the time he was ejected from Sha-Booms and did not know his whereabouts, would see him when the exited.  While waiting, Officer Guittar and Worcester Police Officer Michael Girouard again approached Raymond and stood on opposite sides of him.  The officers asked what Raymond was doing and he explained.  The officers began cursing at Raymond and asking him if he liked to hit women.  The officers began pushing and physically battering Raymond.  They then informed Raymond that he was under arrest.  The officers then physically dragged Raymond to a nearby police cruiser, struck his head on the hood of the cruiser, and continued to punch him while placing handcuffs on him.  The police officers also sprayed Raymond in the face with OC spray.  The police sprayed Raymond without regard for the fact that he had completely submitted to arrest, was already handcuffed, and was bleeding from multiple lacerations as a result of the police beating.  The OC spray went into Raymond's eyes and open wounds, causing additional extreme pain.  After being handcuffed, the officers continued to batter Raymond.  Raymond was placed in a police wagon.

During the melee, Raymond's fiancée, Mioglionico, approached the scene and observed the two officers battering Raymond.  She further observed Raymond covered in his own blood, with blood also on the hood of the police cruiser.  Mioglionico, crying, pled with the officers to tell her why her fiancée was being arrested, and why he was bleeding profusely.  The officers responded by telling Mioglionico to "Get the f____ away from here."  As Mioglionico looked on, one of the police officers lifted Raymond from the hood of the cruiser, and struck him with a closed fist directly in the face, while asking a bystander, "Do you want a piece of this?"  The police then sprayed Mioglionico in the face with OC spray.  The officers placed her in handcuffs, and escorted her into a police wagon.  While stepping into the police wagon, the officer released Mioglionico's arm, causing her to fall backwards onto the floor of the wagon with the handcuffs pushing directly into her back.  As Mioglionico was crying and in pain from being dropped to the floor of the police wagon, the

# BURNS & LEVINSON LLP
### Counsellors at Law

Raymond V. Mariano, Mayor
May 20, 1999
Page 3

police officers began laughing. The officer then picked her up and physically threw her into the police wagon.

Jacubiak stood in the crowd of onlookers and witnessed the beatings and arrests of Raymond and Mioglionico. Jacubiak asked what was going on and one of the police officers ordered him to move back. Simultaneously, another police officer sprayed OC spray into the crowd of onlookers and into Jacubiak's face. Jacubiak dropped to the ground in pain. Officer Guittar then grabbed Jacubiak, stated that he hit a police officer and placed him under arrest. Jacubiak was placed in the police wagon with the others. Jacubiak did not strike any police officer.

While the plaintiffs were being transported to the Worcester Police station, the police wagon was driven extremely fast, and took turns suddenly and sharply, causing the plaintiffs, who were unrestrained in the rear of the wagon, to be thrown and bounced about the passenger area. Once they arrived at the police station, the plaintiffs were placed in holding cells. The cells were extremely filthy and grimy, the blankets were soaked with urine, there was urine on the floor, rotting food, and insects throughout. The police officers failed to provide prompt medical attention to the injured plaintiffs. The plaintiffs remained in holding cells for approximately 90 minutes before the booking process began. Only then were the plaintiffs allowed to rinse their eyes with water to counteract the harmful effects of the OC spray. The police never allowed Mioglionico and Jacubiak to be transported to a hospital for treatment.

Raymond was finally transported to UMass Medical Center approximately two (2) hours after his injuries were inflicted. The police officer that transported him continued to be rude and abusive. When they arrived at the hospital, the officer pulled Raymond out of the wagon in a manner that caused him to fall onto the ground. The officer then threatened to bring Raymond back to the police station without the benefit of treatment unless he moved more quickly into the hospital. However, Raymond could not move any faster because he was handcuffed and in leg shackles at the time. In the trips both to and from the hospital, the officer operated the van at a very high rate of speed, and took sudden and sharp turns, causing Raymond to be thrown and bounced about the passenger area of the wagon.

The Worcester Police Department applied for and secured complaints against the plaintiffs for various criminal charges, all without probable cause. After a jury trial on or about August 4, 1998, all of the plaintiffs were fully acquitted of all of the criminal charges filed against them by the police.

# BURNS & LEVINSON LLP

Counsellors at Law

Raymond V. Mariano, Mayor
May 20, 1999
Page 4

The City of Worcester, through its officers, agents, servants or employees, including its police officers, negligently and/or intentionally (1) unlawfully seized and detained the plaintiffs, (2) instituted a criminal legal process with malice and without probable cause for ulterior purposes, (3) promulgated policies and procedures under the color of law which deprived the plaintiffs of their rights, privileges and immunities secured by the Constitution and the laws of the United States, the Massachusetts Declaration of Rights, and various statutes of the Commonwealth of Massachusetts. As a direct and proximate result of the negligent and/or intentional conduct of the City of Worcester, the plaintiffs have suffered from, and continue to suffer from, physical injury, mental anguish, humiliation, and other damages. The plaintiffs intend to institute claims against the City of Worcester and its police officers for assault and battery, false imprisonment, intentional and negligent infliction of emotional distress, negligence, negligent supervision, malicious prosecution, abuse of process, and federal and state civil rights violations.

Plaintiff Brian Raymond hereby demands the sum of One Million Five Hundred Thousand Dollars ($1,500,000.00) in full settlement of his claims. Plaintiff Jane Mioglionico Raymond hereby demands the sum of Five Hundred Thousand Dollars ($500,000.00) in full settlement of her claims. Plaintiff Christopher Jacubiak hereby demands the sum of Five Hundred Thousand Dollars ($500,000.00) in full settlement of his claims.

I look forward to discussing resolution of these claims with you prior to the six (6) month waiting period for filing legal action.

Very truly yours,

/s/

Michael R. Gottfried

MRG:rkl
49153/21331.0